**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Robert M. LEVINE, Defendant– Appellant.**

**No. 91–3514.**

United States Court of Appeals, Seventh Circuit.

Argued June 7, 1993.

Decided Sept. 27, 1993.

**1102**

Andrew B. Baker, Jr. (argued) Ronald J. Kurpiers, Asst. U.S. Attys., Dyer, IN, for plaintiff-appellee.

Richard S. Kling, Chicago–Kent College of Law, Chicago, IL (argued), for defendant-appellant.

Before BAUER, Chief Judge, KANNE, Circuit Judge, and ALDISERT, Senior Circuit Judge.[1]

BAUER, Chief Judge.

Not too long after the Seventh Day, two brothers, Cain and Abel, were in a field. Cain attacked Abel—and killed him. Although life today is different than it was a generation removed from Eden, some things remain the same. In this case, Robert Levine hired an assassin to kill his brother, Donald Levine, and to kill Donald's family. The assassin killed Donald and his wife Marsha, and tried to kill Donald's son Mark. Robert Levine was convicted of one count of conspiring to use interstate commerce to effect murder for hire and of four counts of using interstate commerce to effect murder for hire. 18 U.S.C. §§ 371, 1958. Levine appeals his conviction and sentence.

## I.

Robert and Donald Levine worked together in a variety of business ventures, mostly involving real estate. Robert and his wife, Pat Steward, lived near Phoenix, Arizona. Robert and Pat formed the Elles Corporation to manage office buildings, homeowners associations, and commercial real estate properties, including three Phoenix shopping centers. The Elles Corporation developed shopping centers owned by various partnerships that included Robert, Pat, and Donald. Donald supplied the money for the shopping center partnerships, both by using money from his wife's family trust and by bringing in other investors.

Donald lived with his family in Munster, Indiana and operated his own commercial retail development business in Chicago. In 1987, Donald and Marsha purchased a home in Phoenix and began spending winters there. Mark Levine was their only child.

In 1988 and 1989, Robert's and Pat's finances were hurt by the collapse of the Phoenix real estate market and they struggled to pay their bills on the shopping centers. They turned to Donald for help and he loaned them money from Marsha's trust. Despite Donald's help, by June 1989 Robert and Pat were in default on a $250,000 loan for which they had pledged the partnership interests.

Donald did not get along with Pat and wanted her out of the business. To do this, he formed a new corporation with Robert, RCDS, to take over the development and management of the shopping centers from the Elles Corporation. In May 1989, Donald planned to move the real estate development operation from the Elles Corporation offices to new offices that he leased for RCDS. Just prior to the move, while Robert and Pat were vacationing in Italy, Donald exploded in a rage. He accused Robert and Pat of stealing from him and misappropriating funds. Donald promised that he would see to it that both of them were put in jail. He dictated letters that accused Pat of mismanagement

---

**1.** The Honorable Ruggero J. Aldisert, Senior Judge of the United States Court of Appeals for the Third Circuit, is sitting by designation.

and of the illegal transfer of funds. He also attempted to gain access to Robert's locked office door by physically breaking it down. Donald canceled the management contracts for the three shopping centers which provided income to the Elles Corporation, and Marsha Levine demanded repayment of $73,500 that Robert owed her. Donald and Marsha Levine widely disseminated their allegations against Robert and Pat to financial backers that Donald brought to the partnership and to friends and business associates in Phoenix, Chicago, and Munster. When Robert returned from his trip and learned of Donald's activities, Robert hired an attorney and threatened to sue Donald if Donald did not stop making his accusations.

Attorney David Kruetzenberg mediated a meeting between Robert and Donald in June 1989 to resolve the dispute. The result was an agreement that stripped Robert and Pat of much of their authority over the partnerships. They were removed as general partners in two of the shopping centers, but continued as limited partners. Robert and Pat also had their partnership interest reduced in return for forgiveness of certain loans. Additionally, Robert and Pat agreed to pay a combined $110,000 back to the shopping center partnerships. Donald withheld Robert's salary at RCDS until Robert and Pat signed the settlement documents.

After their June 1989 meeting and settlement, Robert and Donald continued doing business together at RCDS. Donald was planning on cutting back his Chicago business and concentrating more in Phoenix. He also planned on moving to Phoenix. By July, the dispute appeared settled. It wasn't.

The conflict and resulting settlement between Donald, Robert, and Pat proved disastrous for the Elles Corporation. The management and development contracts that the Elles Corporation lost to RCDS crippled it. Donald also used RCDS to manage the shopping centers formerly managed by the Elles Corporation. Because of the lost revenues, the Elles Corporation was forced to lay off many employees. Moreover, at RCDS, Donald acted as the boss and denied Robert decision-making authority despite corporate

papers that described the two brothers as equal owners.

The relationship between Marsha and Robert also deteriorated. In late September 1989, Marsha told Byron Weis, a business associate and her first cousin, that Robert better hope that Donald lived a long time, because if Donald died, she would put Robert "out on the street." Tr. 1935. Marsha also refused to speak to Robert when he called.

Beginning as early as August 1989, Donald again suspected that Robert was stealing from him and their businesses. Donald told Don Trossman, one of Donald's business associates, that he and Robert had a falling out and that he no longer wanted to be in business with Robert. In early November 1989, Donald told Weis that he believed that Robert was stealing from him again. He repeated that allegation to another of his partners, Robert Greiner, and added that he was going to Phoenix to look at the books.

Meanwhile, in the summer of 1989, Robert visited former Elles Corporation employee Bruce McKinney. McKinney would become Robert Levine's hired assassin. Robert told McKinney that he had a big blowup with Donald, but that everything was going well. In subsequent meetings with McKinney, however, Robert changed his tune. He complained that Donald overreacted to a small accounting error, that Donald told their investing partners that Robert was a thief, and that Donald was going to put Robert in jail. Robert blamed Donald for taking away the management contracts of the Elles Corporation which, he said, caused the company to struggle to meet its payroll. Finally, Robert told McKinney that Donald was coming to Phoenix after Thanksgiving to ruin Robert.

In September or October 1989, Robert allowed McKinney to use Donald's office at RCDS. He explained to RCDS employees that McKinney was going to look for some properties on behalf of RCDS. McKinney, however, was not placed on the RCDS payroll. When McKinney was out of the office, he called Robert four or five times a day. When McKinney was at the office, he and Robert always met alone, behind closed doors. McKinney rented an apartment from Robert and Pat and eventually became man-

ager of the building, thereby reducing his rent.

Robert told McKinney that he had "permission" to kill Donald and even promised to make McKinney a millionaire if he killed Donald. Robert explained to McKinney that once Donald was out of the way, he (Robert) would become general partner in all of the partnerships that owned the shopping centers. As general partner, Robert said that he would have control and be able to do whatever he wanted with the partnerships' assets.

McKinney agreed to kill Donald. The two men discussed various ways to commit murder, including the use of bombs, rifles, guns, and poison. Robert added Marsha and Mark to the hit list because Donald's will left everything to them. Robert explained to McKinney that if only Donald were killed, Marsha and Mark would inherit all of Donald's property. Similarly, if only Donald and Marsha were killed, Mark would inherit all of his parents' property. Therefore, Robert stood to inherit from Donald only if Mark, Marsha, and Donald were killed, either in that order or all at the same time. Robert told McKinney that if he did not kill Donald and Donald's family, the "mob" would kill McKinney's family.

Once McKinney agreed to murder Donald, Marsha, and Mark, Robert provided McKinney with money and other things that McKinney said he needed for the job. For example, Robert gave McKinney two hundred dollars to pay his utility bill and another two hundred dollars for the purchase of a shotgun. Robert also gave McKinney a .25 caliber automatic pistol from Robert's mother's house, a suitcase to transport the guns, and a sixty dollar check from RCDS for bullets. McKinney bought ammunition for the shotgun and the .25 automatic. McKinney also bought exploding bullets for his own gun, a Ruger .357.

On October 18, 1989, Robert and McKinney flew to Chicago. In a sadly ironic twist, the two apparently travelled as brothers; they used the names Peter and Paul Barrett. At the airport, Robert used one of his credit cards to rent a car in his (real) name, and they drove to Munster. Robert took McKin-

ney past Donald's home in Munster and explained the lay-out of the house. Robert also told McKinney that Donald kept guns there and that the house had an alarm system. Without going into the house or meeting Donald, Robert and McKinney drove back to the airport and returned to Arizona.

In late October, Robert gave McKinney a picture of Mark and his parents and sent McKinney in a rented car to Cincinnati, Ohio to kill Mark. Mark, a recent law school graduate, worked as a law clerk for a federal appeals court judge in that city. Robert called Mark at work to get his home address under the guise of seeking help for his stepson who was then a law student. Robert gave McKinney the address and McKinney staked out Mark's apartment building, which had a security guard and surveillance cameras. McKinney spent several days in Cincinnati and visited Mark's apartment building four times. Twice he rode on the elevator with Mark and others. McKinney decided that the apartment building was too secure and that he could not kill Mark in Cincinnati.

After McKinney explained the problem with the situation in Cincinnati, Robert sent him to Munster in case Mark came home for the weekend. Mark did not come to Munster so, after staying there for a couple of days, McKinney drove back to Phoenix, pursuant to Robert's directions.

Robert and McKinney next met on November 8, 1989 in Phoenix. At that meeting, Robert ordered McKinney to return to Munster because Donald, Marsha, and Mark would be there. Mark was coming home because he was going to be sworn in to the Illinois bar on November 9, 1989. Robert gave McKinney six hundred dollars in cash, his driver's license, and his American Express credit card. The plan was that McKinney would pose as a delivery man and go to the Levine home in Munster. Once at Donald Levine's house, McKinney was to shoot everyone inside. After the murders, McKinney was to take cash Marsha kept in her purse and money from a basement safe to make the crime look like a robbery. Robert threatened McKinney by telling McKinney that his family would be killed unless McKin-

ney called him by 10:00 a.m. to tell him that Donald, Marsha, and Mark were dead.

On November 8, 1989, McKinney flew to Chicago as planned, again under the alias Paul Barrett, and rented a car in Robert's name. He drove to the Munster area and checked into a local motel.

On November 9, 1989, McKinney went to the Levine home at about 8:50 a.m. When McKinney arrived, Mark was in the garage putting his bags into one of his parents' cars. McKinney approached the house, handed Mark an express delivery envelope, and had Mark sign for the package on a clipboard. As Mark started into the house after opening the package, McKinney told Mark that he had given him the wrong package. McKinney went to the trunk of his car, put a hair dryer in the package so it would look different, put his .357 in his pocket and returned to Mark. McKinney handed Mark the package, pulled out the gun, and grabbed Mark by the arm. The two of them entered the house.

Once inside, McKinney forced Mark to lie on the floor then pistol-whipped him. As McKinney walked further into the house, Marsha came out of the kitchen and screamed. McKinney shot her in the chest. Mark got up and ran from the house. Just as McKinney noticed Mark's escape, Donald came out of the bathroom and screamed. McKinney shot Donald. After shooting Donald, McKinney turned to leave and, on his way out, shot Marsha again. McKinney did not rob the house as planned, but ran to the rental car and drove off.

Mark, bleeding from the beating McKinney gave him, escaped to a school across the street from the Levine home and screamed for help. Mark called the police from the school and reported a burglar and a shooting at his house. He also called his girlfriend and told her that there had been a shooting and that she should come right away. When he saw that McKinney's car was gone, Mark returned to the house. Mark went to his mother, felt her chest, and, when he realized there was no heartbeat, assumed she was dead. Mark then ran to his father, who he found lying on the ground. Donald was con-

scious, but bleeding profusely. Donald managed to ask Mark how Marsha was. Mark sat with Donald and held Donald's hand. He squeezed Donald's hand but Donald did not squeeze back. A few moments later, Mark hurried to the phone and called his cousin Lorin Brown, a doctor who lived a few blocks away. Mark was unable to reach Brown, so he called the police again. Eventually, ambulances arrived and took Donald, Marsha, and Mark to the hospital.

Marsha Levine died of a gunshot wound to her chest. After emergency surgery at a Munster hospital, Donald died from the gunshot to his chest. Mark was treated for a depressed skull fracture.

After the shooting, McKinney called Robert and told him that Donald and Marsha were dead, but that Mark escaped. After hearing the news of Mark's escape, Robert cursed and said that he would handle Mark. McKinney drove back to the airport and flew to Phoenix.

Other family members notified Robert of what had happened and Robert immediately left Phoenix for Munster. Robert arrived at the hospital at about midnight. When Robert was asked for identification by a security guard at the hospital, he said that he left his driver's license in his other wallet and identified himself with credit cards. Later, Robert told Robert Greiner that his driver's license and a couple of credit cards had been missing from his wallet ever since he had played tennis with McKinney, a week to ten days before the murders. In fact, Robert used his American Express card on November 7, 1989, just two days before the murders, and did not report it lost until November 22, 1989.[2]

At the hospital, Mark was extremely wary of Robert and made sure to have friends around him when Robert was present. Robert tried to meet alone with Mark and became angry when a family friend spent the night with Mark. Robert wanted to move Mark to a Chicago hotel, the Palmer House, and stay with him until he found Mark a new apartment in Cincinnati. Robert told Mark that, as Mark's closest living relative, he

---

**2.** This was the same credit card Robert gave McKinney the day before the murders.

would relocate Mark in Cincinnati and that only the two of them would know Mark's new address.

Mark did not accommodate Robert's wishes. Instead, he stayed at the hospital with family friends. Mark did not attend his parents funeral, but secretly left the hospital under guard. For months, Mark wore a bulletproof vest everywhere and was accompanied by bodyguards.

A few days after the murders, Robert called McKinney from Munster. Robert instructed McKinney to keep his mouth shut because Robert was a suspect. After Robert returned to Phoenix, McKinney returned the .25 automatic to him. About a month after the murders, Robert gave McKinney $600 and told McKinney not to contact him until after January 15, 1990. McKinney was arrested in Phoenix on December 22, 1989. Robert was taken to police headquarters the same day, questioned, and released.

In September 1990, McKinney agreed to cooperate with the FBI to avoid the death penalty for the murders of Donald and Marsha Levine and the attempted murder of Mark Levine. McKinney pleaded guilty to murder and received immunity from the government for his testimony. With McKinney's cooperation, the finger of guilt pointed directly at Robert Levine. On November 14, 1990, an FBI agent took handwriting exemplars from Robert in Phoenix. That was the last time government agents saw Robert for almost four months. To avoid prosecution, Robert decided to become a fugitive. Lawyer Larry Pavilak represented Robert during December 1990 and January 1991. Pavilak was told by the United States Attorney's office that there was a warrant for Robert's arrest. Pavilak communicated that information to Robert.

Robert and Pat sold the Elles Corporation at the end of November 1990 and left Phoenix. They did not leave a forwarding address and even family members did not know where they went. In fact, Robert and Pat went to southern California. In Costa Mesa, California, Robert rented a voice mail service and a private mail box under the alias Steven B. Rosenberg with his wife as Pat Green.

Jeffrey Ross, another of Robert's lawyers, was advised of a scheduled appearance of Robert before the grand jury on January 10, 1991. The grand jury also heard testimony from others, including Robert's brother-in-law, Mitchell Menaker. While still in hiding, Robert did not appear before the grand jury, but called Menaker from an unknown location to express his regret that Menaker was being involved.

On January 13, 1991, Robert and Pat rented an apartment in San Diego, California for $1800 in cash under the names James and Lisa Martinelli. Shortly after they rented the apartment, Robert complained to the rental agent that their car had been stolen. The agent gave them $1200 back to help them over their loss. Robert and Pat also rented another home near the Mexican border. Robert and Pat spent their evenings on the beach, drinking wine and watching the sunset. Robert Levine finally surrendered to the authorities in California on March 4, 1991.

After he turned himself in, Robert Levine was incarcerated at the Metropolitan Detention Center in Los Angeles. His cellmate was John Rinaldo. Rinaldo was awaiting sentencing on convictions for bank fraud and money laundering. Robert and Rinaldo quickly realized that they knew each other from the real estate business and had met during the 1970s. Robert decided to confide in Rinaldo. Robert told Rinaldo that he monitored the investigation and left his home when he felt an indictment was imminent. Robert explained that he first rented a home near the Mexican border after he left Phoenix and that he frequently crossed the border into Mexico. Robert admitted to Rinaldo that he turned himself in only after his attorney informed him that his wife could be charged with harboring a fugitive.

There is more. Robert complained to Rinaldo that if McKinney had only kept quiet, Robert would not have his current problem. Robert explained that he recruited McKinney because he thought that McKinney served in Viet Nam as a Green Beret. He described the murder victim only as a business associate who falsely accused him of stealing money. Robert said that the Mafia

persuaded him to commit the murder because the business associate was involved with the Mafia in a money laundering scheme and had reneged on a deal. Robert told Rinaldo that he travelled to Chicago with McKinney and said that he was concerned because he used an alias but used his credit card for a car rental.

The jury returned guilty verdicts against Robert Levine on all five counts of the indictment. The district court fined him $250,000 and sentenced him to life in prison.

## II.

### A. Testimony About Robert Levine's Alleged Embezzlement

■ At trial, the government produced numerous witnesses that testified to statements that Donald and Marsha made in the months preceding the murders about Robert's alleged embezzlement. Robert contends that such statements were inadmissible hearsay. He also complains that these statements violated his Sixth Amendment right to confront the witnesses against him, that they were improperly admitted as evidence of prior bad acts, and were unfairly prejudicial.

As an initial matter, Robert errs when he characterizes statements made by witnesses at trial as hearsay. The statements that the witnesses repeated—comments by Donald and Marsha that Robert stole from them— were not hearsay because they were not offered to prove the truth of the matters asserted in the statements. *See* Fed.R.Evid. 801(c). Rather, that testimony was offered to prove Robert's motive for hiring McKinney to murder Donald, Marsha, and Mark. The inference is obvious. Donald and Marsha made repeated statements to business associates in Arizona, Chicago, and Munster that Robert was stealing from them and their businesses. Robert found out about the statements, became angry, and hired McKinney. The evidence was properly admitted as background to show Robert's state of mind and to show Robert's motive. *See United States v. Colston,* 936 F.2d 312, 317 (7th Cir.) (evidence not hearsay when admitted as background and to show state of mind), *cert. denied,* — U.S. —, 112 S.Ct. 403, 116

L.Ed.2d 352 (1991). Nor did the admission of this evidence violate the Confrontation Clause. *See, e.g., Martinez v. McCaughtry,* 951 F.2d 130, 134 (7th Cir.1991) (when a statement is not hearsay, the confrontation clause is not implicated).

■ Finally, we reject Levine's contention that the evidence was unfairly prejudicial, cumulative, or confusing. Fed.R.Evid. 403. The testimony established that. Donald and Marsha widely circulated allegations of theft by Robert. The breadth of their dissemination was probative of Robert's motive for killing them. The evidence at trial further indicated that Donald reduced Robert's interest in the partnership and that, according to McKinney, Donald was out to ruin Robert. The evidence also showed that hostility existed between Robert and Marsha.

We review the district court's evidentiary rulings for abuse of discretion. *United States v. Hanson,* 994 F.2d 403, 406 (7th Cir.1993). That discretion was not abused here when the court admitted testimony about the allegations of embezzlement made by Donald and Marsha Levine in months prior to their deaths.

### B. Flight Evidence

■ Robert Levine's next complaint is that the district court improperly admitted evidence of his flight to avoid prosecution. We disagree.

■ The probative value of flight as evidence of a defendant's guilt depends on the degree of confidence with which four inferences can be drawn: (1) from behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged. *United States v. Kord,* 836 F.2d 368, 372 (7th Cir.), *cert. denied,* 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988). In this case, the degree of confidence with which the jury could have drawn these inferences is substantial. Robert Levine's behavior included: selling his business, running off to California, repeatedly crossing into Mexico, leaving no forwarding address, and using

phony names. We could go on, but the point is made. The probative value of Robert Levine's flight is substantial.

■ Robert Levine counters by pointing out that he did not flee for more than a year after the murders. That fact is certainly true. It is also true, however, that Robert Levine had no reason to flee until he realized that he might face criminal sanctions for the murders. The evidence at trial indicated that Robert closely monitored the on-going investigation and left his home when he realized he would be indicted. *See United States v. Jackson,* 572 F.2d 636, 640 (7th Cir.1978) (as time interval between crime charged and flight expands, evidence of defendant's knowledge that he or she is sought for the crime becomes an increasingly important factor). The evidence of flight was properly admitted.

### C. *Ineffective Assistance of Counsel*

■ Robert Levine claims that his trial counsel performed so poorly that he was denied his Sixth Amendment right to the effective assistance of counsel. He raises this issue for the first time on appeal. Ordinarily, such claims are better addressed before the district court, either by a motion for a new trial or in collateral proceedings. *United States v. Brocksmith,* 991 F.2d 1363, 1368 (7th Cir.1993). In the interest of judicial economy, however, we will resolve an ineffective assistance of counsel claim if the issue is sufficiently clear-cut. *Id.* We have reviewed Robert Levine's allegations and the record. We conclude that the record is adequately developed for us to decide the issue here.

■ To succeed on an ineffective assistance of counsel claim, a convicted defendant must show first that his trial counsel's performance was deficient. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Biggerstaff v. Clark,* 999 F.2d 1153, 1154 (7th Cir.1993). Second, the defendant must show that the deficient performance prejudiced the defense and deprived the defendant of a fair trial, that is, of a trial whose result is reliable.

*Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Biggerstaff,* 999 F.2d at 1154. Robert Levine has not established either that his trial counsel's performance was deficient or that any mistakes by his trial counsel deprived him of a fair trial.

Robert Levine points to several aspects of the trial that he says amount to error by trial counsel. He claims that trial counsel did not cite authority in support of motions, did not adequately impeach witnesses against him, was unprepared as to basic legal issues, and did not object often enough at trial. Our review of the record indicates otherwise.

First, Robert Levine's trial counsel filed literally dozens of pre-trial motions with proper citation to legal authority. Further, trial counsel zealously defended Robert at trial. Trial counsel proposed—and vigorously pursued—an alternative theory of the case: that Mark Levine hired McKinney to murder Donald and Marsha Levine. On cross-examination of Mark Levine, for example, Robert Levine's counsel forcefully questioned Mark about his own actions, his alleged greed, and his relationships with family members. Trial counsel also pursued his theory that Mark Levine was motivated by greed when he questioned Frances Levine, Mark's grandmother and the mother of Donald and Robert. Robert's lawyer aggressively pursued this theory with another witness, Eli Salzman, Mark's college roommate. Robert's trial counsel pressed Salzman for details as to just how much Mark Levine cared about money. These are just a few examples. The record as a whole reveals that Robert Levine's counsel performed well within the range of legal competence when he examined witnesses at trial. The record also reveals that his lawyer was quite prepared on legal issues and that he made numerous objections. For example, Robert Levine's attorney objected at trial that the evidence was cumulative. He also persuaded the court to admit evidence of two polygraph examinations of Mark Levine.[3] Much of the alleged ineffectiveness of trial counsel relates to evidence—for example, flight evidence and testimony about Donald and Marsha Levine's accusations of embezzlement—that was prop-

---

**3.** The results of the polygraph tests of Mark Levine were inconclusive.

erly admitted. Moreover, trial counsel did object to the admission of the bulk of this evidence.

■ We note that Robert Levine's trial counsel is strongly presumed to have rendered effective assistance. *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. Robert Levine has offered nothing that rebuts that presumption. Our review of the record indicates that Robert Levine was not denied the effective assistance of counsel at his trial.[4]

## D. Fine

■ Robert Levine's final contention is that the district court improperly fined him. He claims the court failed to make specific findings on the record prior to levying the $250,000 fine.

■ Before imposing a fine on a criminal defendant, the district court was required to consider several factors pursuant to 18 U.S.C. § 3572(a) and U.S.S.G. § 5E1.2(d).[5] We give due regard to the district court's determinations in sentencing and will reverse the court's factual findings only if they are clearly erroneous. 18 U.S.C. § 3742(e); *United States v. Blackman*, 950 F.2d 420, 425 (7th Cir.1991).

In this case, Robert's presentence investigation report discussed at length his financial situation and his ability to pay the fine. At the sentencing hearing, the district court adopted the report's factual statements as its findings of fact. *See Blackman*, 950 F.2d at 425 (district court satisfied requirement to make findings before imposing a fine when it weighed defendant's presentence report); *United States v. Bradach*, 949 F.2d 1461, 1463–64 (7th Cir.1991) (same). The court heard additional evidence about Robert Levine's ability to pay. These additional facts indicated that after his bankruptcy reorganization, Robert Levine would have assets accrue to a worth of $850,000. Also, the record reveals that Robert was one of two beneficiaries to his eighty-one year old mother's $1.6 million dollar trust fund.

The district court considered Robert Levine's ability to pay, including his earning

---

4. The government also moved to strike two affidavits that Robert Levine attached to his brief to bolster his ineffective assistance of counsel claim. These two affidavits are outside the record in this case and we decline to consider them on this appeal. We therefore grant the government's motion and strike the affidavits, and any references to them, from the record.

5. Section 3572(a) states:

In determining whether to impose a fine, and the amount, time for payment, and method of payment of a fine, the court shall consider, in addition to the factors set forth in section 3553(a)—

(1) the defendant's income, earning capacity, and financial resources;

(2) the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose;

(3) any pecuniary loss inflicted upon others as a result of the offense;

(4) whether restitution is ordered or made and the amount of such restitution;

(5) the need to deprive the defendant of illegally obtained gains from the offense;

(6) whether the defendant can pass on to consumers or other persons the expense of the fine; and

(7) if the defendant is an organization, the size of the organization and any measure taken by the organization to discipline any officer, director, employee, or agent of the organization responsible for the offense and to prevent a recurrence of such an offense.

18 U.S.C. § 3572(a). Guidelines section 5E1.2(d) (1990) provides:

In determining the amount of the fine, the court shall consider:

(1) the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

(2) any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

(3) the burden that the fine places on the defendant and his dependents relative to alternative punishments;

(4) any restitution or reparation that the defendant has made or is obligated to make;

(5) any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;

(6) whether the defendant previously has been fined for a similar offense; and

(7) any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d).

capacity, as required by statute and by the United States Sentencing Guidelines. 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d)(2). The court also considered the government's position that the court should fine Robert Levine severely so as to limit his ability to *hire another hit man to kill Mark Levine* (or anyone else).

Robert Levine bore the burden of showing that he could not pay the fine. *United States v. Jones*, 983 F.2d 1425, 1434 (7th Cir.1993). He has not carried that burden. The district court properly fined Robert Levine.

### III.

Robert Levine's conviction and sentence are

AFFIRMED.