**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Bernard J. MORGANO, Dominick Palermo, Nicholas Guzzino, Peter Petros, Sam Nuzzo, Jr. and Samuel Glorioso, Defendants–Appellants.**

Nos. 92–1828, 92–1829, 92–2069, 92–2144 and 92–2224.

United States Court of Appeals, Seventh Circuit.

Argued April 8, 1994.

Decided Oct. 13, 1994.

Rehearing Denied Dec. 20, 1994.

Andrew B. Baker, Jr., (argued), Philip P. Simon, and Michael A. Thill, Asst. U.S. Attys., Office of the U.S. Atty., Dyer, IN, for plaintiff-appellee.

Richard F. James, James, James & Manning, Dyer, IN, Kevin E. Milner; Ronald D. Menaker, Arnstein & Lehr, Chicago, IL, F. Allen Tew, Jr. (argued), Indianapolis, IN, Scott L. King (argued), King & Meyer, Gary, IN, Michael J. Troumouliaris, Merrillville, IN, and Daniel R. Goeglein (argued), Lyons

& 'Truitt, Valparaiso, IN, for defendants-appellants.

Before CUMMINGS and RIPPLE, Circuit Judges, and TINDER, District Judge.[1]

TINDER, District Judge.

Six defendants were convicted by a jury of operating a racketeering enterprise, 18 U.S.C. § 1962(c) (RICO), conspiring to operate a racketeering enterprise, 18 U.S.C. § 1962(d), interstate travel in aid of racketeering, 18 U.S.C. § 1952, illegal gambling, 18 U.S.C. § 1955, and extortion, 18 U.S.C. § 1951, in the United States District Court for the Northern District of Indiana. Each was subsequently sentenced to a lengthy prison term. All Defendants appeal their convictions and several challenge their sentences. Because their appeals were consolidated, numerous issues must be addressed in this opinion. Issues raised by all Defendants jointly include whether consecutive sentences for the RICO conviction and separate substantive offenses constitute double jeopardy, the applicability of the United States Sentencing Guidelines to the RICO conspiracy conviction and whether the nexus between their criminal activity and interstate commerce (as required by 18 U.S.C. § 1951) was proven. Other issues, raised by individual Defendants, include Guzzino's contention that the district court improperly fined him; Petros' challenge of the district court's ruling on his claim of mental incompetency, the lack of evidence of his participatory link to the conspiracy, and the competency of his legal counsel; Glorioso's contention that the district court improperly denied him a sentence reduction for acceptance of responsibility; and Nuzzo's challenges to the computation of the offense level for his sentence.

## I. Background

The facts of this case, though somewhat tedious and spanning a period of four years, deserve attention before proceeding to the legal issues raised by Appellants. Defendant Bernard Morgano owned and operated a restaurant in Gary, Indiana, which was used as a "count house" for an illegal lottery operated by Al Watkins and Anthony Leone.[2] In addition to charging Watkins and Leone a fee for the use of his restaurant, Morgano collected from them, on behalf of the Chicago "syndicate," a "street tax" of fifteen percent of the lottery's gross receipts for protection and the right to operate the gambling enterprise. As will shortly be seen, the evidence adduced at trial indicated Morgano (or "Snooky" as he was called) became a central figure in establishing the syndicate's presence in northwestern Indiana. Defendant Peter Petros also worked for the syndicate collecting street tax from gambling operations in northwest Indiana, including the operators of tavern-based gambling machines. Some of Petros' unsavory activities included forcibly collecting $1000 a month from a restaurant owner who ran an illegal gambling business by threatening to harm the owner and his family; collecting $2500 per month from an operator of video poker machines after implying his business might be destroyed if he refused; attempting to collect protection money from two other video poker machine operators; and attempting to extort protection money from the operator of a betting house in Gary, Indiana. Overseeing Petros and Morgano's activities was a gentleman named Frank Zizzo, the coordinator of gambling operations in this region of Indiana for the Chicago syndicate.

Morgano, unable to carry on all the illicit activities by himself, eventually hired Anthony Leone to help collect the street tax and paid him $1000 a month for his services. Confiding in Leone, Morgano explained the money they collected was eventually turned over to the syndicate in Chicago. Some of their "taxpayers" included Steve Sfouris, who paid $1500 each week out of the receipts of an illegal dice game (known as "barbooth") operated in his restaurant; Tony Penzato, another gambling operator in the area who

---

1. The Honorable John Daniel Tinder, of the United States District Court for the Southern District of Indiana, sitting by designation.

2. Leone and others (including Sam Nuzzo, Sr., Arthur Nuzzo, Sandra T. Mynes, Jennifer Kaufman, Anthony J. Ottomanelli and Ned Pujo) were also indicted by the grand jury but entered into plea agreements with the Government. Yolande Pujo was also indicted but charges against her were subsequently dismissed at the Government's request. One other indicted defendant, Steve Sfouris, remains at large.

paid $500 a month; and Sam Nuzzo, Jr., also a Defendant in this action who paid $500 per month to protect his illegal sports and horse betting operation. To coordinate their efforts, Morgano, sometimes with Leone, travelled from northern Indiana to Illinois frequently (some twelve times in a three month period) to meet with Defendants Dominick Palermo, Nicholas Guzzino and Zizzo at a restaurant known as "The Taste of Italy" in Calumet City, Illinois. Though these meetings were conducted surreptitiously by the Defendants, they did not escape the Government's electronic surveillance and several conversations occurring at The Taste of Italy were recorded and ultimately used as evidence to convict the Defendants. After Zizzo died sometime in March, 1986, he was replaced by Morgano to coordinate gambling for the syndicate in the region. Palermo, with whom Morgano met on a number of occasions at The Taste of Italy, was Morgano's boss and the person to whom Morgano delivered the street tax he collected. To protect this operation from law enforcement interference, Morgano bribed a local sheriff and two other police officers for an extended period of time. Guzzino assisted Morgano's efforts to collect street tax, in effect serving as Morgano's second-in-command. Once in April, 1986, when Morgano was hospitalized due to a heart attack, Guzzino directed Morgano's cohort Leone to handle collections while Morgano was out of commission, going so far as to inform those who paid money to Morgano that Leone would be collecting in Morgano's place for a short time. Any money collected by Leone was delivered to Morgano's home.

Sam Glorioso was another lieutenant in this operation who, among other things, collected money from the owner of a Greek coffee house (John Mantis) in Hammond, Indiana, who used his business to operate an illegal poker game. Unable to get along with Glorioso, at some point John asked Morgano for someone else to collect his protection money. Morgano sent Leone with Glorioso to inform John that Leone would take over collections from that time forward. Following this meeting John paid Leone at least once, if not on several occasions. Meanwhile, Morgano, who started his own poker game with Defendant Sam Nuzzo, Jr., arranged to have a "dirty" Gary police officer (who, in actuality, was an undercover Federal Bureau of Investigation (FBI) agent posing as a cop on the take) protect their game and raid competing gambling establishments. Morgano planned to have Glorioso visit the establishments following each raid to arrange protection payments—offering to prevent police interference in exchange for money. One owner who was raided but steadfastly refused to pay, Franklin Burton, found the windows in the front door of his business shot out by Morgano and Leone in an attempt to coerce him into paying the street tax. Immediately following this incident Burton received telephone calls threatening his family with injury unless he paid the protection money. Instead of succumbing to the pressure, Burton approached the FBI and agreed to record his conversations with the Defendants. During one of these dialogues, Glorioso related to Burton that the syndicate had, on a past occasion, broken somebody's legs for failing to pay a $300 debt—implying, of course, that the same fate would befall him if he refused to pay. After confirming with Nuzzo Glorioso's connection to the syndicate, Burton eventually agreed to pay Glorioso about $500 per month.

Several "bookies" in St. Joseph County were also the victims of the syndicate's extortion. Morgano had Leone and Petros collect protection money from several operators of illegal football betting games in that area. These bookies, Edward Strawmier, Donald Pytel, and Jeffrey Dunk, were extorted by the syndicate from the fall of 1986 until sometime in November, 1987, making payments amounting to some $1100 during each month of both the 1986 and 1987 football season. Leone and Petros were delegated other duties by Morgano, such as extorting money from Louis Gerodemos, the operator of gambling parties at his restaurant in Lake of the Four Seasons, Indiana. Morgano, accompanied usually by Leone, met with Gerodemos on a number of occasions in an attempt to convince him to pay street tax. These meetings were largely unsuccessful until Morgano was accompanied by his boss, Guzzino, whom Gerodemos feared because he knew Guzzino was allied with the syndicate and failure to pay might result in harm to

him or his family. During one of these meetings, Guzzino explained to Gerodemos that Morgano was the coordinator of all gambling activity in Indiana. After this, Gerodemos eventually arranged to pay $1000 per month for protection.

Not only did Nuzzo assist in the extortion activities, he and his family also operated a betting operation. Bets were placed with Nuzzo's sisters, Sandra Mynes and Jennifer Kaufman, and bettors would settle their accounts with Ned Pujo (who owned the Beer Barrel Tavern), Nuzzo, Sam Nuzzo, Sr. (Nuzzo's father), or Arthur Nuzzo (Nuzzo's brother). The Nuzzo family also distributed football "parlay" cards for betting. The operation suffered a slight set-back in November, 1987, when the FBI raided this and other gambling establishments, seizing money, records, betting stubs and packets of parlay cards. Despite this raid, the Nuzzo betting operation continued after some encouragement from Morgano—he was under pressure from Chicago to generate more revenue and therefore needed more gambling activities in the region. One patron of the Nuzzo betting operation was Robert Graczyk who, after some unsuccessful betting, found himself $20,000 in debt to Nuzzo. To nudge Graczyk into paying his debt, two individuals named "Bob" and "Bingo" visited him on behalf of Nuzzo, physically attacking him and threatening his family with violence if he failed to pay. Eventually, Graczyk settled his debt.

On January 11, 1991, following a lengthy investigation, a federal grand jury returned a thirty count superseding indictment against the Defendants. The indictment charged each defendant, in Count 1, with conducting the affairs of an illegal gambling enterprise through a pattern of racketeering activity in violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c); to substantiate this charge the government alleged the Defendants engaged in fifty-seven predicate acts of criminal conduct. The second count of the indictment charged each defendant with engaging in a racketeering conspiracy contrary to 18 U.S.C. § 1962(d). Count 3 charged Morgano, Palermo and Guzzino with conducting an illegal gambling business (a "barbooth" game) from January, 1983 to June, 1987, in violation of 18 U.S.C. § 1955. A similar illegal gambling charge was raised in Count 4 against Morgano, Palermo, Guzzino and Nuzzo for their operation of an illegal sport gambling business. Morgano was charged with three counts of extortion (Counts 5–7) and nine counts of interstate travel in aid of racketeering (Counts 21–24 and 26–30), the former in violation of 18 U.S.C. § 1951 and the latter contrary to 18 U.S.C. § 1952. Palermo (Counts 22, 24 and 26–27) and Guzzino (Counts 21–30) were also charged with interstate travel in aid of racketeering. Guzzino (Count 7), Petros (Counts 9–12), and Nuzzo (Counts 8 and 20) were also charged with extortion in violation of 18 U.S.C. § 1951. Each defendant pled not guilty to all counts. Following a lengthy trial, a jury found all the defendants guilty on all counts, except Guzzino who escaped a guilty verdict on Count 25 of the indictment charging him with interstate travel in aid of racketeering. Sentencing soon followed, with each Defendant receiving multiple terms of imprisonment and, in Guzzino's case, a hefty fine.

## II. Double Jeopardy

Defendants collectively argue that consecutive sentences for the RICO offense charged in Count 1 and the separately charged extortion, interstate travel, and gambling violations in Counts 3 to 30 violate the Double Jeopardy Clause of the Fifth Amendment because the latter offense also served as predicate acts supporting the RICO conviction, serving to enhance the RICO sentence and as the foundation of separate consecutive sentences for the separate charges. Essentially Defendants believe they were subjected to multiple punishment for the same offense, an occurrence, which if true, would undoubtedly violate the Double Jeopardy Clause. *United States v. Halper*, 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487 (1989); *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076–77, 23 L.Ed.2d 656 (1969); *United States ex rel. Young v. Lane*, 768 F.2d 834, 837 (7th Cir.), *cert. denied*, 474 U.S. 951, 106 S.Ct. 317, 88 L.Ed.2d 300 (1985). Defendants were each convicted of one count of racketeering, in violation of 18 U.S.C. § 1962(c). Underlying this count were fifty-seven predicate racketeering acts, some of which the jury found (by separate

interrogatory) each Defendant committed and others of which the district court found to have occurred by a preponderance of the evidence for sentencing purposes. Because the court found that at least one of these predicate (No. 57) acts occurred after November 1, 1987, it employed the United States Sentencing Guidelines to calculate Defendants' RICO sentences. Although the Guidelines dictated a base offense level of nineteen for racketeering, U.S.S.G. § 2E1.1(a), the predicate racketeering acts were considered "pseudo-counts" of the indictment and, pursuant to § 3D1.1 of the Guidelines, the district court grouped together these acts into separate offense groups and increased each Defendants' sentence by five levels pursuant to Guidelines § 3D1.4. *See* U.S.S.G. § 2E1.1 cmt., n. 1. All this is quite appropriate, admit the Defendants, if not for the fact they were also convicted of several substantive criminal acts and sentenced on those acts under pre-Guidelines law because they occurred prior to November 1, 1987. Those acts happen to correspond identically with at least some of the predicate acts relied upon to enhance the RICO sentences.[3] Thus, Defendants' acts of extortion, interstate travel, and gambling served two purposes. First, they enhanced the RICO sentence; second, they produced separate, consecutive sentences for illegal gambling, extortion, and interstate travel in aid of racketeering. To generalize somewhat, Defendants characterize the crimes of illegal extortion, gambling, and interstate travel as the specific "offenses" for which they were punished twice: Once when sentenced for committing those crimes, and again when these same criminal acts were employed to determine the consecutive, not concurrent (as will become evident, the distinction is important), RICO sentences.

■ Although the Sentencing Guidelines express a preference for concurrent sentences unless consecutive sentences are necessary to achieve the applicable Guideline range, U.S.S.G. § 5G1.2(c)-(d), undoubtedly a sentencing court enjoys broad discretion in deciding whether Guidelines and pre-Guidelines sentences will run concurrently or consecutively. *United States v. Ewings*, 936 F.2d 903, 910 (7th Cir.1991); *United States v. Watford*, 894 F.2d 665, 669 (4th Cir.1990). But acknowledging a court has discretion to freely choose among competing alternatives simply means it may freely choose among the set of *allowable* alternatives. This, of course, begs the question regarding the scope of the set of permissible alternatives, a set whose content is constrained often-times by statute, the Sentencing Guidelines themselves or, as Defendants argue in this case, by a constitutional provision such as the Double Jeopardy Clause. Thus the predicate inquiry is whether the Defendants' sentences exposed them to double jeopardy—a question, contrary to the Government's belief, not answered by this court's decision in *Ewings*. *Ewings* simply affirmed the district court's exercise of discretion under the Sentencing Guidelines but did not discuss the implications of the Double Jeopardy Clause on consecutive Guidelines and non-Guidelines sentences based on identical conduct. *See Ewings*, 936 F.2d at 910.

■ Although multiple punishment is proscribed by the Double Jeopardy Clause, the proscription is a limited one in the context of a challenge to sentencing procedures, providing no more protection than to prevent a sentencing court from punishing a defendant more than Congress intended. *Garrett v. United States*, 471 U.S. 773, 793, 105 S.Ct. 2407, 2418–19, 85 L.Ed.2d 764 (1985); *United States v. McKinney*, 919 F.2d 405, 417 (7th Cir.1990). The sole question is whether Congress, in making the predicate RICO acts relevant to sentence determination via the Sentencing Guidelines, intended to allow defendants to receive consecutive sentences for both the predicate acts and the RICO offense. If the same conduct violates more

---

**3.** Each Defendant was found to have participated in various and varied predicate racketeering acts and received different terms of incarceration for both the predicate offenses and the RICO crime. It is unnecessary, however, to list the specific acts relevant to each Defendant or the specific sentences each Defendant received; suffice it to note that each Defendant was indeed found to have engaged in predicate acts which correspond directly to offenses alleged in substantive counts of the indictment and each Defendant received consecutive sentences based on the RICO offense and the substantive counts. These commonalities provide the basis for Defendants' argument and the differences specific to each Defendant do not change the analysis or outcome.

than one criminal statute, that question is answered by employing a tool of statutory interpretation commonly referred to as the "*Blockburger*" rule, after the seminal case of *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), to discern if Congress meant for RICO and the predicate acts to be different, not the same, offense and therefore allow conviction and cumulative punishment for each. *Garrett*, 471 U.S. at 778, 105 S.Ct. at 2411. Relying on the *Blockburger* form of analysis, this court has, on at least two previous occasions, held that a RICO violation is not the "same offense" as the predicate acts used to substantiate that violation for purposes of the multiple prosecution prong of the Double Jeopardy Clause. *United States v. Cyprian*, 23 F.3d 1189, 1198 (7th Cir.1994); *United States v. O'Connor*, 953 F.2d 338, 344 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 1979, 118 L.Ed.2d 578 (1992). The Government can, without running afoul of double jeopardy, prosecute and secure convictions for both racketeering and the predicate illegal acts alleged to be the "racketeering activity" required under § 1962(c) to secure the RICO conviction.

■ Defendants do not, however, contend they were impermissibly *prosecuted* for both RICO and the predicate acts as substantive offenses; instead, grounding their argument in the multiple punishment prong of double jeopardy, they assert they suffered double jeopardy upon receiving consecutive sentences for the RICO conviction and the substantive crimes convictions because each sentence was based on the same conduct. Perhaps the simple answer to this problem is, given that RICO and the predicate acts are not the same offense, Defendants clearly were never punished twice for the same crime: Defendants were punished once for racketeering and once (but separately) for extortion, gambling, and interstate travel. It just so happens the Sentencing Guidelines consider the predicate racketeering acts (i.e. extortion, gambling, and interstate travel) relevant to computing the appropriate sentence for racketeering. *See* U.S.S.G. § 2E1.1(a). Though the commission of these acts increased the racketeering sentence, the Defendants were punished for racketeering—the predicate acts were merely conduct

relevant to the RICO sentence. Accepting Defendants' argument would essentially invalidate the whole host of sentencing processes which rely, in some fashion, on previously or concurrently prosecuted and punished conduct, including the use of prior criminal conduct to enhance sentences through the criminal history category concept of the Sentencing Guidelines, *see* U.S.S.G. § 4A1.1, as well as the currently popular recidivist statutes. *See United States v. Duarte*, 28 F.3d 47, 48 (7th Cir. 1994). As the *Duarte* court noted in rejecting a double jeopardy challenge to the use of a prior criminal conviction to enhance the sentence for a current conviction, the "basic mistake was to confuse prosecution or conviction, on the one hand, with using evidence of one crime in determining the punishment of another. [Defendant] could not be prosecuted more than once for the same offense, but he could be prosecuted for the offense and punished more severely for another offense because he has committed [the earlier] one." *Id.*

■ Use of underlying conduct to determine where, along the relevant sentencing range established by Congress, a defendant's sentence should fall is not a novel development of the Sentencing Guidelines, but rather an approach to sentencing which was ultimately quasi-codified in the Guidelines. *See United States v. Pinto*, 875 F.2d 143, 145 (7th Cir.1989). A sentencing court's use of a wide variety of information and history about a convicted defendant, provided it is sufficiently reliable, has been upheld against constitutional attack again and again. *E.g., United States v. Masters*, 978 F.2d 281, 286 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2333, 124 L.Ed.2d 245 (1993). Provided Defendants could be convicted for both RICO and predicate act offenses (which they could) and provided the sentencing court could consider the predicate acts in assessing the RICO sentence insofar as they were conduct relevant to the RICO act (which it could) no double jeopardy problem portends. Under this rationale, it seems nonsensical for Defendants to characterize their consecutive sentences as multiple punishment for the "same offense" and in violation of the Double Jeopardy Clause. The district court could,

without violating double jeopardy, impose consecutive punishment on both the RICO offense and the predicate crimes—and so holds every other court of appeals to consider the question of consecutive sentences for RICO and predicate act convictions. *E.g., United States v. Beale,* 921 F.2d 1412, 1436–37 (11th Cir.), *cert. denied sub nom. Loriga v. United States,* —— U.S. ——, 112 S.Ct. 100, 116 L.Ed.2d 71 (1991); *United States v. Grayson,* 795 F.2d 278, 283 (3d Cir.1986), *cert. denied,* 481 U.S. 1018, 107 S.Ct. 1899, 95 L.Ed.2d 505 (1987); *United States v. Hampton,* 786 F.2d 977, 979–80 (10th Cir.1986); *United States v. Truglio,* 731 F.2d 1123, 1129–30 (4th Cir.), *cert. denied,* 469 U.S. 862, 105 S.Ct. 197, 83 L.Ed.2d 130 (1984); *United States v. Sutton,* 700 F.2d 1078, 1080–81 (6th Cir.1983); *United States v. Greenleaf,* 692 F.2d 182, 189 (1st Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983); *United States v. Hawkins,* 658 F.2d 279, 286–88 (5th Cir.1981); *United States v. Boylan,* 620 F.2d 359, 361 (2d Cir.), *cert. denied,* 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980); *United States v. Rone,* 598 F.2d 564, 571–72 (9th Cir.1979), *cert. denied sub nom. Little v. United States,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980).

■ Of course, this court has openly alluded to, and other circuits have outright accepted, the possibility of a double jeopardy problem if, in sentencing a defendant for the same crime occurring both pre-Guidelines and post-Guidelines, the court imposes consecutive sentences formulated (at least in part) by considering the total amount of loss in the instance of a property crime, or total quantity of substance involved, in the case of a drug offense, flowing from the entire course of criminal conduct. *See United States v. Randall,* 947 F.2d 1314, 1320 (7th Cir.1991). *See also United States v. Roederer,* 11 F.3d 973, 976–77 (10th Cir.1993); *United States v. Scarano,* 975 F.2d 580, 584 (9th Cir.1992); *United States v. Niven,* 952 F.2d 289, 293–94 (9th Cir.1991). Contrary to these cases is *United States v. Gaudet,* 966 F.2d 959 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1294, 122 L.Ed.2d 685 (1993), which rejected the idea that double jeopardy in any way limits the sentencing court's discretion to impose consecutive pre- and post-

Guidelines sentences based on the same conduct, though for its conclusion it mistakenly relied on a case, *United States v. Parks,* 924 F.2d 68 (5th Cir.1991), which failed to even consider the implications of double jeopardy on this sentencing situation. No matter really, for while cases like *Roederer, Niven,* and *Scarano* share some superficial similarities to the problem of RICO/predicate act consecutive sentences, their persuasive value is limited either by a fundamental dissimilarity to our case or suspect reasoning which seemingly ignores well-established doctrine. True, these cases all involved, or at least considered, double jeopardy limits on consecutive sentences for offenses subject to both pre- and post-Guidelines sentences. And, in calculating the Guidelines sentence the courts did rely on conduct (in the form of losses or quantity of drugs involved) which also formed the bases for the pre-Guidelines offense sentence. However, these cases ignored, in the most basic sense, the narrow import of the Double Jeopardy Clause in sentencing—to protect the defendant from receiving a sentence in excess of the statutory maximum penalty. Provided this edict is met, and provided the Sentencing Guidelines and sentencing statutes are adhered to in calculating the sentence, it makes little difference how the court arrived at its conclusion about the appropriate sentence. None of these cases inquired whether the pre-Guidelines crimes were the "same offense" as the post-Guidelines crime (which, by the way, they probably were not) nor considered if the court exceeded the statutory maximum penalty in any sentence (which it probably did not). Eschewing any doctrinal foundation in our double jeopardy jurisprudence makes these decisions less than attractive candidates for emulation. To the extent this court's decision in *Randall* is contrary to our holding today, it was merely dicta inasmuch as the sentencing court in that case explicitly divvied up the losses between pre- and post-Guidelines courts. *Randall,* 947 F.2d at 1320. Thus, we decline to propagate the reasoning and analysis contained in those decisions.

■ Although Defendants could have received up to twenty years of imprisonment for violating § 1962(c), 18 U.S.C. § 1963(a),

none received this maximum penalty nor, of course, any penalty exceeding the maximum. The same is true for the separately charged and convicted predicate offenses of extortion, gambling and interstate travel—the Defendants' sentences for their crimes are well within the statutory range. Consonant with the circumscribed protection afforded by the Double Jeopardy Clause in sentencing matters, "calculation under the Federal Sentencing Guidelines of the proper sentence within the statutory range established by Congress ... does not constitute multiple punishment." *United States v. Alvarez,* 914 F.2d 915, 920 (7th Cir.1990), *cert. denied,* 500 U.S. 934, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991). *See United States v. Saunders,* 973 F.2d 1354, 1365 (7th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1026, 122 L.Ed.2d 171 (1993) (applying *Alvarez* ). Coupling this with the deference bestowed on a sentencing court to consider practically any conduct, provided it fits within the Sentencing Guidelines formula and is sufficiently reliable, in arriving at an appropriate sentence for a particular crime, no double jeopardy problem arises when a sentencing court considers other charged and sentenced conduct in deriving the length of a consecutive sentence imposed for violation of a separate criminal statute. Thus, the district court did not submit the Defendants to double jeopardy by simply relying on the predicate acts in calculating the RICO sentence, despite the fact that the predicate acts served to impose separate, concurrent sentences.

### III. Applicability of Guidelines

Next, Defendants jointly argue that the district court erred in finding, as a sentencing fact, the RICO offense continued beyond November 1, 1987. The impact of this decision concerns the applicability of the Sentencing Guidelines to that count of the indictment. Because they failed to raise this argument during sentencing, it is waived on appeal, *United States v. Rivero,* 993 F.2d 620, 623 (7th Cir.1993); *United States v. Blythe,* 944 F.2d 356, 359 (7th Cir.1991), and we review instead only for plain error, FED. R.CRIM.P. 52(b); *Rivero,* 993 F.2d at 623—a category of error rather elusively described as having the combined characteristics of being egregiously incorrect and highly preju-

dicial to the defendant's rights. *Peretz v. United States,* 501 U.S. 923, 952, 111 S.Ct. 2661, 2678, 115 L.Ed.2d 808 (1991). *See also Blythe,* 944 F.2d at 359; *United States v. Walker,* 9 F.3d 1245, 1249 (7th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 1863, 128 L.Ed.2d 485 (1994). Here, neither attribute accurately describes the district court's decision to apply the Sentencing Guidelines to the conspiracy conviction.

Any offense committed on or after the effective date of the Sentencing Guidelines (November 1, 1987) is subject to sentencing under the strictures of the Guidelines, *United States v. Rossy,* 953 F.2d 321, 325 (7th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 1240, 117 L.Ed.2d 473 (1992), including conspiracies which straddle this date, *United States v. Masters,* 924 F.2d 1362, 1369 (7th Cir.), *cert. denied,* 500 U.S. 919, 111 S.Ct. 2019, 114 L.Ed.2d 105 (1991); *United States v. Fazio,* 914 F.2d 950, 958–59 (7th Cir.1990). While the Government alleged in Count 2 of the indictment, by incorporating the predicate acts contained in Count 1, Defendants engaged in two different predicate acts supporting the RICO conspiracy past this date (acts Nos. 30 and 57) the jury did not, in the special interrogatories, find any Defendant committed either act. At sentencing the district court (applying the less onerous "preponderance of the evidence" burden of proof, *id.; United States v. Macias,* 930 F.2d 567, 570 (7th Cir.1991)) exceeded the jury's determination and decided the Defendants did indeed commit these acts, concluding the RICO conspiracy extended past the effective date of the Guidelines. Because of the variance in the standard of proof guiding each fact-finder's decision, a sentencing court may find the existence of certain facts despite a jury's implicit or explicit rejection of that fact. *United States v. Masters,* 978 F.2d 281, 285–86 (7th Cir.1992). If the Government proved the Defendants' conspiracy continued beyond the effective date of the Guidelines by a preponderance of the evidence, the Guidelines apply, *Rossy,* 953 F.2d at 325; *United States v. Osborne,* 931 F.2d 1139, 1144 (7th Cir.1991), regardless of the jury's decision.

■ Given that the sentencing court was not foreclosed from arriving at a factual conclusion different from that of the jury, the only remaining question is whether the finding that the conspiracy extended past November 1, 1987, was plain error. Strawmier, the operator of an illegal gambling business who was being forced to pay street tax, testified, consistent with the Government's allegation in predicate act No. 30, that he made his last payment to Leone (collecting on behalf of Morgano) sometime in November, 1987. Although Leone contradicted Strawmier, testifying he ceased collection efforts after being confronted by FBI agents in October, 1987, the district court was free to choose between this competing evidence—giving credence to Strawmier but rejecting Leone's statement. That choice cannot be clearly erroneous and certainly is not plain error. *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985); *United States v. Brown*, 900 F.2d 1098, 1102 (7th Cir.1990). Similarly, ample evidence was offered from which the district court could conclude members of the conspiracy collected the Graczyk debt, which arose from an illegal gambling business operated through 1988, well past the beginning of November, 1987. Graczyk himself testified as to these facts, creating a sufficient evidentiary basis for the district court's finding. *United States v. Cedano–Rojas*, 999 F.2d 1175, 1180 (7th Cir.1993); *United States v. Caicedo*, 937 F.2d 1227, 1236 (7th Cir.1991).[4] Thus the district court's factual finding that the conspiracy continued beyond the effective date of the Guidelines was not plain error.[5]

■ Glorioso, though disavowing any reliance on the Defendants' joint argument, raises a related issue. Instead of claiming the conspiracy ended before November 1, 1987, Glorioso maintains that he withdrew from the conspiracy prior to that date and thus is not subject to Guideline sentencing. Of course, if he withdrew from the conspiracy prior to the effective date of the Guidelines he is not subject to Guidelines sentencing for his participation. *United States v. Price*, 988 F.2d 712, 723 (7th Cir.1993). But proving one has withdrawn from a conspiracy is no easy matter, requiring the defendant to prove he both ceased participation in the conspiracy, *United States v. DePriest*, 6 F.3d 1201, 1206 (7th Cir.1993), and affirmatively disavowed the conspiracy's purpose, *United States v. Bafia*, 949 F.2d 1465, 1477 (7th Cir.1991), *cert. denied sub nom. Kerridan v. United States*, — U.S. ——, 112 S.Ct. 1989, 118 L.Ed.2d 586 (1992). Glorioso contends he was involuntarily terminated from the conspiracy by Leone and Morgano sometime in June, 1987; because of this, he argues, there was neither a need nor an opportunity for him to effect a withdrawal. And besides, he argues, informing the authorities of the conspiracy's existence would have been much too dangerous to him given his cohorts' propensity for violence. Unfortunately, merely ceasing participation in a conspiracy—whether on one's own initiative or involuntarily—is never enough to withdraw from the conspiracy unless accompanied by some affirmative act,

4. Because we find the district court's factual finding regarding the occurrence of predicate act No. 57 was not erroneous, we can easily dismiss Defendants' joint argument that the same finding was an "abuse of discretion" (an incorrect statement of the standard of review of sentencing court factual findings) because it resulted in a one point enhancement in Glorioso and Nuzzo's base offense level by elevating the amount extorted over the $10,000 threshold. *See* U.S.S.G. § 2B3.2(b)(2). Because sufficient evidence, as detailed in the text, supported the finding, neither the facts nor the conclusion were clearly erroneous and enhancement was appropriate.

5. Defendants expend quite a bit of energy attempting to demonstrate the relevance of *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), to their position that the district court erred in deciding an overt act in furtherance of the RICO conspiracy continued past November 1, 1987. This energy is simply misplaced. The *Grunewald* Court, after noting the need for some overt act in furtherance of a conspiracy to occur within the relevant statute of limitations period for a prosecution to be valid, discussed the various means of satisfying the "overt act" requirement, such as evidence indicating the defendants concealed the conspiracy during the limitations period. *Id.* at 397, 77 S.Ct. at 970. *See Masters*, 924 F.2d at 1368 (explaining the narrow holding of *Grunewald*). The extortions of Strawmier and Graczyk are clearly direct acts in furtherance of the conspiracy which occurred during the relevant time period (post November 1, 1987), making the marginal analysis contained in *Grunewald* irrelevant.

such as a confession to authorities or a clear communication to co-conspirators of abandonment of the conspiracy's goals. *United States v. Pitz,* 2 F.3d 723, 729 (7th Cir.1993), *cert. denied sub nom. DuPont v. United States,* —— U.S. ——, 114 S.Ct. 2141, 128 L.Ed.2d 869 (1994); *Bafia,* 949 F.2d at 1477. Even if Glorioso stopped participating in the venture in June, 1987, he was required to take affirmative action to disavow the conspiracy's purpose to effectuate a withdrawal, even if he was dismissed from the alliance by his co-conspirators. *DePriest,* 6 F.3d at 1206–07; *Bafia,* 949 F.2d at 1477; *United States v. Schweihs,* 971 F.2d 1302, 1323 (7th Cir.1992). Having readily admitted he took no such affirmative action, Glorioso has failed to carry his burden of demonstrating he withdrew from the conspiracy and, instead, clearly remained a member of the illegal plot until the end. He was thus subject to sentencing under the Sentencing Guidelines for his role in the conspiracy.

**IV. Hobbs Act & Interstate Commerce**

■ Defendants next challenge the sufficiency of the evidence to support their conviction for violating the Hobbs Act, 18 U.S.C. § 1951(a). In full, § 1951(a) provides:

> Whoever in any way or degree *obstructs, delays, or affects commerce or the movement of any article or commodity in commerce,* by robbery or extortion or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a) (emphasis added). Defendants contend the evidence was insufficient to establish the required connection of their criminal conduct to interstate commerce. Because the Hobbs Act has been interpreted to reach the outer limit of the Commerce Clause, *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960), evidence indicating Defendants' conduct had a realistic probability, or "potential," of affecting interstate commerce, even if no actual effect occurred, is sufficient to support their conviction. *United States v. Heidecke,* 900 F.2d 1155, 1164 (7th Cir.1990); *United States v. Rindone,* 631 F.2d 491 (7th Cir.1980). Being essentially an attack on the sufficiency of the evidence to prove the elements of the crime, so long as sufficient evidence was presented from which any rational fact-finder could find this element of the crime satisfied, the conviction must be upheld. *United States v. Campbell,* 985 F.2d 341, 344 (7th Cir.1993).

■ The parties stipulated that Gerodemos' Indiana restaurant ("Mr. G's") was supplied natural gas from outside Indiana. Evidence adduced at trial, viewed in the light most favorable to the Government, *United States v. Jean,* 25 F.3d 588, 595 (7th Cir. 1994), indicated Gerodemos and another gentleman named Arnie Bard oversaw illegal gambling at Mr. G's. Taped phone conversations between Morgano and Nuzzo were introduced, indicating Defendants attempt to extort street tax from both Bard and Gerodemos. If Gerodemos paid any portion of the tax, as the evidence suggests and rationally implies, the interstate commerce requirement of the Hobbs Act is surely satisfied under the so-called depletion of assets theory. This theory provides that "commerce is affected when an enterprise, which neither is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted through extortion, thereby curtailing the victim's potential as a purchaser of such goods." *United States v. Elders,* 569 F.2d 1020, 1025 (7th Cir.1978). *See also United States v. Hocking,* 860 F.2d 769, 777 (7th Cir.1988) ("The fact that a business-firm victim of extortion or attempted extortion purchases supplies that are manufactured or otherwise originate from out of state ... is sufficient proof of a nexus to interstate commerce to trigger a jury finding of a Hobbs Act violation under the depletion of assets theory."), *partially rev'd on other grounds, United States v. Levy,* 955 F.2d 1098, 1103–04 n. 5 (7th Cir. 1992). Because any money Gerodemos paid for street tax reduced the money available to purchase out-of-state natural gas, interstate commerce would be sufficiently affected to satisfy the Hobbs Act. *United States v. Boulahanis,* 677 F.2d 586, 590 (7th Cir.1982), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982) (interstate commerce re-

quirement satisfied because social club paying extortion had less funds from which to purchase usual $68 per month of out-of-state coffee); *United States v. Shields,* 999 F.2d 1090, 1098 (7th Cir.1993) (lawyers' paying of bribes satisfied interstate commerce requirement because depleted money otherwise available to purchase law supplies from outside state); *United States v. Murphy,* 768 F.2d 1518, 1530–31 (7th Cir.1985), *cert. denied,* 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986) (same).

Defendants disagree that the evidence proved Gerodemos paid any street tax, however, and instead argue that the evidence indicated Gerodemos' partner (Arnie Bard) made all the payments. If so, say Defendants, their conduct had no effect on Gerodemos and thus neither his restaurant nor interstate commerce. We can accept Defendants' view of the evidence, which is not totally without support in the record, and still conclude that the interstate commerce requirement of the Hobbs Act was satisfied. For even if Bard rather than Gerodemos paid the street tax, the evidence clearly indicated that Guzzino, Nuzzo and Morgano attempted to collect money from Gerodemos and, on numerous occasions, threatened him if payment was not made. Attempts to obstruct, delay, or affect commerce coupled with threats, even if unsuccessful and never resulting in the illegal extraction of money, sufficiently affect commerce to satisfy the Hobbs Act. *United States v. Cole,* 984 F.2d 221, 223 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2983, 125 L.Ed.2d 679 (1993). *See also Rindone,* 631 F.2d at 494 (stating Hobbs Act "jurisdiction is satisfied by an implied, even unrealizable, threat to affect the future business operations of the victim if the extortionate demand is not met."). The mere fact Gerodemos was threatened, even if never resulting in actual payment of money to the Defendants, sufficiently affects commerce to satisfy the Hobbs Act. Because ample evidence in the record exists from which the jury could reasonably have found a threat to extort money, if not even a completed extortion, which if acted upon would deplete Gerodemos' assets, the evidence was sufficient to sustain the Hobbs Act interstate commerce element and the convictions are valid.

## V. Guzzino's Fine

■ Guzzino challenges the $185,000 fine imposed upon him by the district court, arguing that the court's failure to make specific factual findings regarding the fine, and imposition of the fine in contradiction of his ability to pay, is clearly erroneous. While normally the sentencing court's factual findings are reviewed for clear error, 18 U.S.C. § 3742(e), and its legal interpretation and application of the Guidelines to those facts under a "due deference" formula—meaning somewhat less stringently than *de novo, id.*—Guzzino utterly failed to object to the manner in which the fine was imposed or the actual imposition of the fine during sentencing and therefore has waived the issue for appeal. *United States v. Strauser,* 21 F.3d 194, 197 (7th Cir.1994); *United States v. Lashmett,* 965 F.2d 179, 185 (7th Cir.1992); *United States v. Mizyed,* 927 F.2d 979, 982 (7th Cir.), *cert. denied,* 500 U.S. 937, 111 S.Ct. 2065, 114 L.Ed.2d 470 (1991). Thus, our review of the lower court's decision is limited to deciding if the imposition of the fine was plain error, a concept described above. *United States v. Rivero,* 993 F.2d 620, 623 (7th Cir.1993). Because part of the fine was imposed on the Guidelines counts ($125,000) and part on the pre-Guidelines offenses ($60,000), the district court was required to inquire into two different statutory standards. For pre-Guidelines offenses, a sentencing court must consider the nine factors listed in 18 U.S.C. § 3622(a) (repealed Nov. 1, 1986), *United States v. Radix Labs., Inc.,* 963 F.2d 1034, 1043 (7th Cir.1992); post-Guidelines sentences are imposed after reviewing the items contained in 18 U.S.C. § 3572(a) and U.S.S.G. § 5E1.2(d).

■ Regardless which set of standards apply, before imposing a fine the sentencing court must at least consider the applicable statutory factors, *United States v. Vargas,* 16 F.3d 155, 159 (7th Cir.1994); *United States v. Masters,* 924 F.2d 1362, 1369 (7th Cir.1991), or at least the factors relevant to the particular case. *United States v. Bradach,* 949 F.2d 1461, 1464 (7th Cir.1991). In most instances this obligation may be satisfied if the court explicitly adopts the findings contained in the Pre–Sentence Report ("PSR"), provided those findings and the PSR sufficiently ana-

lyze each statutory factor. *Id.; United States v. Levine,* 5 F.3d 1100, 1109 (7th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1224, 127 L.Ed.2d 569 (1994); *United States v. Blackman,* 950 F.2d 420, 426 (7th Cir. 1991). Because the statutes and Guidelines only mandate the sentencing court to "consider" the relevant factors, the district court is under no obligation to enter specific findings as to *each* factor. The record must merely indicate the court considered the statutory factors, in general, in arriving at the fine. *Radix Labs., Inc.,* 963 F.2d at 1043–44. In Guzzino's case, the district court did indeed explicitly adopt the findings contained in the PSR at sentencing. The PSR, in turn, discussed at length Guzzino's ability to pay the fine in terms of his financial resources, financial obligations, and the needs of his dependents for financial support. Moreover, during sentencing, the district court, noting the PSR analysis, explicitly found Guzzino able to pay the fine. This consideration and analysis is more than sufficient to support the imposition of Guzzino's fines, both under pre-Guidelines and Guidelines law, and is not error, let alone the plain error necessary to reverse the district court's decision in this instance.

## VI. Petros' Claims

Peter Petros, individually, raises three challenges to his conviction, two of which concern the district court's denial of his motion under 18 U.S.C. § 4241(a) for a mental competency hearing; the last concerns the sufficiency of the evidence to prove Petros' participatory link to the RICO conspiracy.

### A. Psychiatric Examination

First, Petros asserts the district court erred in denying his pre-trial motion for a psychiatric examination. That motion was made on March 20, 1991, pursuant to 18 U.S.C. § 4241(a), which provides that "[a]t any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant." 18 U.S.C. § 4241(a). This is essentially a two-phase process, requiring the court to grant the motion for a hearing before it is obligated to

actually hold the competency hearing. Shortly after Petros' motion, the district court held a hearing to inquire "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense" exists. *Id.* Following the hearing, the court issued a written entry denying Petros' motion for a formal competency hearing, finding no "reasonable cause" to believe he was incompetent. Petros argues that decision was erroneous because the court failed to sufficiently consider his evidence of a history of mental incompetency.

Section 4241(a) prescribes the procedural formula to be used by a district court to decide if a defendant deserves a hearing to determine if he is competent to stand trial, the mental competency of a criminal defendant being a fundamental predicate to a fair trial under the Due Process Clause of Fifth Amendment. *Pate v. Robinson,* 383 U.S. 375, 385, 86 S.Ct. 836, 842, 15 L.Ed.2d 815 (1966); *United States v. Collins,* 949 F.2d 921, 924 (7th Cir.1991). The starting point in all this is the notion that a criminal defendant is presumed to be competent to stand trial and bears the burden of proving otherwise. *Chichakly v. United States,* 926 F.2d 624, 633 (7th Cir.1991). Though the decision not to order a § 4241(a) hearing is an exercise of the district court's discretion, reviewed only for an abuse of that discretion, *United States v. Goines,* 988 F.2d 750, 782 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 241, 126 L.Ed.2d 195 (1993), "the failure to grant such a hearing in the face of sufficient evidence to establish reasonable cause to believe that a defendant is mentally incompetent is a violation of due process" in and of itself, *United States v. Garrett,* 903 F.2d 1105, 1116 (7th Cir.), *cert. denied,* 498 U.S. 905, 111 S.Ct. 272, 112 L.Ed.2d 227 (1990). The district court's factual findings regarding competency are disturbed only if clearly erroneous. *United States v. Bennett,* 908 F.2d 189, 195 (7th Cir.), *cert. denied,* 498 U.S. 991, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990). The exact quantum of evidence necessary to establish "reasonable cause" is dif-

ficult to describe with any certitude, though the reasonableness aspect of the inquiry clearly places the focus on the facts viewed objectively (what a reasonable person would think of the facts) rather than analyzing the subjective propriety of the district court's decision. *Collins,* 949 F.2d at 924; *Chichakly,* 926 F.2d at 633.

The sole evidence offered by Petros to sustain his claim of incompetency was his own testimony, in both the form of an affidavit and responses to the court's questioning during the hearing on the § 4241(a) motion, and averments of his attorney in response to the court's questioning. While this evidence did indeed indicate a history of mental difficulties, including Petros' discharge from the military for mental illness in 1952, a period of institutionalization in 1975, and determinations by the Social Security Administration that he was disabled due to mental illness in both 1978 and again as recently as 1990, the district court properly focused its inquiry to Petros' mental state at the time of the hearing, yet still considered the evidentiary import of his history of mental illness. *Garrett,* 903 F.2d at 1117 ("[P]rior psychiatric commitments are not necessarily dispositive of whether 'the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent....'"). Upon questioning by the court, Petros' counsel acknowledged his belief that Petros understood the nature of the criminal charges against him and that Petros had been helpful and more cooperative than the average criminal defendant in assisting in preparation for trial.[6] An averment such as this by a supposedly incompetent defendant's attorney at most wholly negates the requisite finding under § 4241(a) that the defendant be "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense," *id.,* and at least casts grave doubt on the defendant's incompetency. Who but the defendant's attorney knows best if the accused is able to assist in his own defense?

Perhaps unsatisfied with the statements of Petros' attorney and the affidavit offered by Petros, the district court decided to question Petros (after securing his attorney's permission) at the hearing. Under oath, Petros admitted he understood the nature of the charges and proceedings pending against him yet baldly and self-servingly asserted he did not know the difference between right and wrong.[7] This latter revelation is, however,

---

6. This is evidenced by the following dialogue with Petros' attorney which occurred during the hearing:

THE COURT: Does [Petros] understand the nature and consequences of these proceedings against him? I presume you've explained it to him.

MR. MCGRATH: I have explained it to him, Your Honor—

THE COURT: Does he understand it?

\* \* \* \* \* \*

MR. MCGRATH: As best as I can determine, yes.

\* \* \* \* \* \*

THE COURT: Describe to me the difficulties, if any, you have experienced in attempting to advise your client or in attempting to secure his assistance. Have you had any?

MR. MCGRATH: No.

\* \* \* \* \* \*

THE COURT: In formulating whatever defenses you might have or formulating or preparing yourself for trial, I take it you asked him questions?

MR. MCGRATH: I have.

THE COURT: And have those responses to those questions been helpful to you in your preparation for trial?

MR. MCGRATH: They have been helpful.

THE COURT: He's assisted you then in his defense?

MR. MCGRATH: To the degree that I've required him to assist me, Your Honor. He has, in fact, agreed with my evaluation of the evidence. He's agreed with my evaluation of the charges against him. He's agreed with my suggestions and determinations as to a course of defense, but again, Your Honor, I don't know that agreement is the product of a healthy mind or unhealthy mind.

. . . . .

Tr. of Hrg. on Mot. for Incompetency Hrg. at 5–7.

7. This occurred during the following exchange between the district court and Petros:

THE COURT: Did you discuss with your lawyer and did he explain to you the nature of the charges that have been filed against you by the Government?

PETROS: Yes, sir.

THE COURT: Did you understand them when he explained them to you?

PETROS: I think I do.

THE COURT: Any doubt in your mind about that?

PETROS: I don't know the difference between right and wrong, Your Honor. I've

quite irrelevant to the inquiry mandated by § 4241(a), which focuses on whether the defendant "is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). Even adding Petros' testimony to the hesitance expressed by his attorney regarding whether Petros truly understood the proceedings, it was not an abuse of the district court's discretion to conclude reasonable cause to question Petros' competency did not exist. Cumulatively, the evidence, including the testimony and statements offered by Petros and his attorney, as well as the observations made by the district court of Petros' demeanor when testifying, supports the court's decision that no reasonable cause existed to believe Petros did not understand the charges against him or was unable to assist in his defense.

## B. Ineffective Assistance of Counsel

 The reason he lost his request for a hearing under § 4241(a), argues Petros, is the incompetency of his attorney. Based on that belief, Petros asserts (for the first time on appeal) that his trial counsel so incompetently handled the § 4241(a) motion as to deny him his Sixth Amendment right to counsel. Because the district court has the opportunity to observe an attorney's conduct and serves as the best forum in which to develop a factual record relevant to an ineffective assistance claim, these claims are ordinarily best brought first in the district court, either as a motion for a new trial or in a collateral proceeding following conviction. *United States v. Levine,* 5 F.3d 1100, 1108 (7th Cir.1993); *United States v. Mojica,* 984 F.2d 1426, 1452 (7th Cir.), *cert. denied sub nom. Castaneda v. United States,* —— U.S. ——, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). If a sufficient evidentiary record of the perceived incompetent conduct already exists, and the defendant is willing to rest his claim on that record rather than take the opportunity to present evidence to the trial court, the court of appeals need not defer to the lower court and refuse to entertain the ineffective assistance claim because the appellate court then stands in as good a position as the trial

court to resolve the issue. *See Mojica,* 984 F.2d at 1452; *United States v. Asubonteng,* 895 F.2d 424, 428 (7th Cir.), *cert. denied sub nom. Rivers v. United States,* 494 U.S. 1089, 110 S.Ct. 1830, 108 L.Ed.2d 959 (1990). So while it may seem the defendant confronts the dilemma of either raising the ineffectiveness claim on direct appeal, and thereby relying solely on the trial record, or bringing the claim in the trial court with the concomitant possibly beneficial ability to present additional evidence supporting the ineffectiveness of the trial counsel, *United States v. Taglia,* 922 F.2d 413, 417–18 (7th Cir.), *cert. denied sub nom. McDonnell v. United States,* 500 U.S. 927, 111 S.Ct. 2040, 114 L.Ed.2d 125 (1991), many of this court's decisions have refused to even review, let alone reject, a defendant's claim of ineffective assistance of counsel if first raised on direct appeal and the court of appeals perceives the trial record as being inadequate to decide the issue. *E.g., United States v. Marshall,* 985 F.2d 901, 906 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993); *Mojica,* 984 F.2d at 1452; *United States v. D'Iguillont,* 979 F.2d 612, 614–15 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1873, 123 L.Ed.2d 492 (1993). This is so despite the defendant's presumably voluntary decision to immediately charge forward with the claim on direct appeal. Given that Petros bears the burden of proving his trial counsel was ineffective, the absence of an adequate record from which to gauge the competence of the attorney could simply result in a denial of the argument for failure of the Defendant to carry his burden of proof. This, however, is not the procedure in this circuit and rightly ought not be—courts need not resolve every issue before them if either the timing or materials presented may result in an improvident decision. In this vein, Petros' ineffective assistance claim simply cannot be decided on the record as it currently stands. To eventually succeed on this argument, Petros must demonstrate both that his trial counsel's performance was seriously deficient and that this deficient performance prejudiced his defense and ultimately

---

been examined by seven psychiatrists who say I've been mentally ill since I was seven years old.

Tr. of Hrg. on Mot. for Incompetency Hrg. at 24.

deprived him of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). To satisfy the deficiency prong, Petros notes his attorney's failure to present witnesses, records or other evidence of Petros' past mental history and institutionalization at the § 4241 hearing as proof of Petros' present diminished mental capacity to stand trial. Because the affidavit and testimony of Petros' counsel offered during the hearing in the district court clearly shows the attorney was aware of Petros' psychological past, but did not present evidence of this past, this case is slightly different than *Balfour v. Haws*, 892 F.2d 556 (7th Cir.1989) or *United States v. Hubbard*, 929 F.2d 307 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991), cases in which a defense attorney wholly failed to pursue evident clues of possible defenses or mental defect. Instead the inquiry is whether the conduct of Petros' attorney was objectively reasonable, knowing what he knew about Petros' past, in deciding not to present additional evidence of Petros' mental health history. *United States v. Booker*, 981 F.2d 289, 292 (7th Cir.1992) ("[T]he defendant must prove that his counsel's performance was below an objective standard of reasonableness."); *United States v. Williams*, 934 F.2d 847, 851 (7th Cir.1991) (same). But we only know *what* the attorney did not do (i.e. present that evidence), not *why* he did not do so—and the *why* is more important than the *what* in this circumstance. *See United States v. Johnson–Wilder*, 29 F.3d 1100, 1104 (7th Cir.1994) (choosing to raise ineffective assistance initially on appeal "is nearly always the wrong one for an appellant because typically the trial record will be silent about the *reasons* for actions taken by trial counsel."); *Mojica*, 984 F.2d at 1452 ("Because [defendant's] allegations, which primarily concern litigation strategy, depend upon evidence outside the record, we decline to rule on this issue."); *D'Iguillont*, 979 F.2d at 614–15 (refusing to resolve ineffective assistance claim on direct appeal when issue turned on reason for attorney's conduct and no evidence on that point existed in the record).

Even if we were to agree that Petros' attorney should have presented additional evidence (which we do not at this point), no one really knows what this evidence would have shown or proved. Petros merely asserts, in a conclusory fashion, that the evidence would have provided grounds for the district court to find reasonable cause to believe he was indeed incompetent to stand trial. Something more, in the form of a detailed explanation of the contents and value of the additional evidence, must be offered before a court can conclude the attorney's failure to offer the evidence was ineffective assistance. *United States v. Hubbard*, 929 F.2d 307, 310–11 (7th Cir.1991) (noting "[t]he mere assertion of unspecified evidence obviously proves nothing."); *United States v. Gramley*, 915 F.2d 1128, 1133 (7th Cir.1990) (stating "[T]his court has made clear that a petitioner alleging that counsel's ineffectiveness was centered on a supposed failure to investigate has the burden of providing ... 'a comprehensive showing as to what the investigation would have produced.' "). Perhaps the attorney made a tactical decision to forego presentation of the extra evidence; or maybe it simply involved too much effort—effort he did not want to expend to track down all the records, psychiatrists and medical experts. Because trial counsel's tactical decisions received great deference in assessing ineffective assistance claims, *United States v. Jackson*, 983 F.2d 757, 760–61 (7th Cir.1993), which of these possibilities, if any, are true is critical to resolving the issue, yet are unknown absent some factual development in the trial court on this point. Thus, we decline to review this claim on the record before us on direct appeal. This declination does not preclude Petros from seeking collateral relief, but he should note that a more complete record will be necessary to examine this issue.

## C. Sufficiency of Evidence

▆ Lastly, Petros challenges the sufficiency of the evidence to establish his participatory link to the overall RICO conspiracy for which the Defendants were convicted under 18 U.S.C. § 1962(d). Sufficiency of the evidence arguments are, to say the least, difficult to mount with any success. So long as the evidence offered at trial, viewed in a light most favorable to the Government, was sufficient to allow *any* rational trier of fact to

find the essential elements of the crime beyond a reasonable doubt, the conviction is upheld. *United States v. Santos,* 20 F.3d 280, 282 (7th Cir.1994). "To prove that a defendant was a member of a conspiracy, the Government must demonstrate a participatory link between the conspiracy and the defendant." *United States v. Campbell,* 985 F.2d 341, 344 (7th Cir.1993). Proof of the participatory link requires substantial evidence that the defendant both knew of the conspiracy and that he intended to join and associate himself with the conspiracy's criminal design and purpose. *Id.* at 344–45; *United States v. Durrive,* 902 F.2d 1221, 1229 (7th Cir.1990). This requires proof the defendant did more than merely know the conspiracy existed, approved of the conspiracy, associated himself with the conspiracy or was present during some conspiratorial activities. *Durrive,* 902 F.2d at 1225. Keeping all this in mind, it becomes quite clear that ample evidence was presented to support Petros' RICO conspiracy conviction. Petros not only collected some $2500 a month from one poker machine vender (Reginald Kinkade) during 1984 to 1986, but attempted to collect street tax from other video machine vendors as well as operators of other gambling games. More importantly, at trial Kinkade testified that Petros identified himself as being affiliated with the "Chicago Mob," an association Kinkade confirmed when Frank Zizzo, the local syndicate boss and a central figure in the conspiracy, identified Petros as "his man." Petros also spoke with Kinkade about having the "old man" (Zizzo's nickname) approve the amount of Kinkade's payments. A surreptitiously taped conversation between Petros and another operator of video poker games, Tim Janowsky, contained many references by Petros to his boss, the "old man." Evidence also indicated Petros, in 1986, informed Kinkade that Zizzo had died and that "Snooky" (Morgano) was now in charge of collections. Beyond the testimony of victims of the extortion, other members of the conspiracy confirmed Petros' participation. Leone, for example, testified that he met Petros through Morgano, and that Petros was, at the time of their introduction, collecting street tax for Zizzo. From this evidence of distinct relationships between Petros and other known members of the conspiracy, it was clearly possible for the trier of fact to

conclude Petros not only knew of the conspiracy, but joined, associated, and participated in the conspiracy's goals and operations. Given that, the evidence is sufficient to establish Petros' participatory link to the conspiracy and thus enough to validate his conviction.

### VII. Glorioso and Acceptance of Responsibility

At sentencing, Glorioso requested, but the district court denied, a two-level reduction in his base offense level for acceptance of responsibility for his criminal conduct as allowed under U.S.S.G. § 3E1.1. This decision is one of fact, particularly suited for the district court to make, and will not be disturbed unless clearly erroneous. *United States v. Osmani,* 20 F.3d 266, 269 (7th Cir.1994); *United States v. Fuller,* 15 F.3d 646, 650 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2689, 129 L.Ed.2d 820 (1994). *See also* U.S.S.G. § 3E1.1 cmt., n. 5 ("The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on appeal."). Acceptance of responsibility simply means "the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." U.S.S.G. § 3E1.1(a). An oft-recited application note to § 3E1.1 reminds defendants of the central purpose of the acceptance of responsibility reduction: "This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1 cmt., n. 2. The sum total of Glorioso's acceptance of responsibility consists of his confession, *following conviction* and in preparation of sentencing, of his criminal conduct. Not until trial was complete and an unfavorable verdict returned did Glorioso admit his crimes and express any, albeit a paltry, sense of remorse for his acts. Awarding the two-level reduction for this would be contrary to the basic system of incentives and disincentives established by the acceptance of responsibility reduction, namely to reward those who plead guilty—saving the judiciary

and Government from the time, expense and effort of a trial—or who take "some other equivalently concrete act, such as pretrial payment of full restitution." *United States v. Gomez,* 24 F.3d 924, 926 (7th Cir.1994); *United States v. Beserra,* 967 F.2d 254, 255 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 419, 121 L.Ed.2d 341 (1992) ("A plea of guilty is (normally) a necessary, but is not a sufficient, condition" for the reduction). Post-conviction confessions imbue relatively no benefit on the criminal justice system and therefore are undeserving of the *quid pro quo* of decreased imprisonment. *Beserra,* 967 F.2d at 256.

 There are, and constitutionally must be, certain limited instances in which a defendant can put the Government through the machinery of a trial but still realistically claim the benefit of the acceptance of responsibility reduction, such as admitting the factual elements of guilt but challenging the constitutionality of a statute. *See, e.g.,* U.S.S.G. § 3E1.1 cmt., n. 2; *United States v. Corral–Ibarra,* 25 F.3d 430, 440 (7th Cir. 1994) (going to trial to assert defense of entrapment may still allow acceptance of responsibility reduction). Glorioso's only explanation for pursuing a trial, and foregoing a guilty plea, was his desire to avoid being forced to testify against his co-defendants, presumably out of fear of their reprisal. No matter, he made a conscious decision to forego the benefits of the acceptance of responsibility reduction and opt instead for the security of not being a squealer—possibly the more rational decision but unfortunately not one the sentencing guidelines recognize as worthy of excusing the need to accept responsibility before the trial to win a reduced sentence. He adds that during trial he also refrained from challenging his factual guilt by refusing to offer evidence contradicting the Government's case. Forebearing from denying responsibility is not, however, the same as accepting responsibility, the latter of which requires some affirmative act evidencing a clear "fessing up" of one's guilt for the crimes charged. U.S.S.G. § 3E1.1(a); *Beserra,* 967 F.2d at 255; *United States v. Escobar–Mejia,* 915 F.2d 1152, 1153 (7th Cir. 1990). All in all we can quite confidently say the district court did not err in refusing to grant Glorioso the two-point reduction for accepting responsibility.

## VIII. Nuzzo's Sentence

The last issue to be considered is Sam Nuzzo's claim that the district court erred in computing his offense level. Specifically, he raises three perceived errors.

 First, Nuzzo contends the court erred in determining the base offense level for his RICO conviction. Because the proper application of the Guidelines is a question of law, the trial court's computation is reviewed de novo. *United States v. Gaines,* 7 F.3d 101, 103 (7th Cir.1993); *United States v. Hayes,* 5 F.3d 292, 294 (7th Cir.1993). Nuzzo, convicted on the racketeering count, was found by the jury to have committed predicate acts Nos. 27 and 55, both of which charged the collection of an illegal debt by extortionate means. Guidelines § 2E1.1, applicable to racketeering acts, provides for a base offense level of nineteen or the level appropriate to the substantive crime involved in the conspiracy, whichever is greater. U.S.S.G. § 2E1.1(a). Nuzzo contends that because his predicate acts were closer to running an illegal gambling business (18 U.S.C. § 1955), than extortion (18 U.S.C. § 1951), his base offense level under § 2E1.1(a) should be that applicable to illegal gambling per § 2E3.1—which would be twelve. Unfortunately the Defendant (and the Government as evidenced by its brief) simply misconceives the command of § 2E1.1(a), which, as the comments to that section explain, establishes a mandatory minimum offense level of 19—a floor under which the base offense level may not be set no matter what the offense level may be for the predicate acts associated with the RICO violation. U.S.S.G. § 2E1.1 cmt., n. 3 ("If the offense level for the underlying racketeering activity is less than the alternative minimum level specified (*i.e.,* 19), the alternative minimum base offense level is to be used."). *See United States v. Ford,* 21 F.3d 759, 765 (7th Cir.1994) (noting § 2E3.1's level nineteen floor). Even assuming the Defendant is correct in his belief that the predicate acts are more analogous to gambling than extortion (which is a big assumption), his

base offense level under § 2E1.1(a) would still be nineteen. All he could possibly hope to accomplish by selecting a different offense to which to tie his predicate act is to *increase* the base offense level—not to lower it below nineteen. The district court was thus correct in starting with a base offense level of nineteen.

Second, Defendant contests the district court's finding that Nuzzo played a managerial role in the offense and the associated increase, per Guidelines § 3B1.1(a), of his base offense level by three levels. The Guidelines direct the court to increase the offense level by three levels if "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive...." U.S.S.G. § 3B1.1(b). Nuzzo specifically challenges the district court's determination that the predicate act for which he received the enhancement, the collection of an illegal debt by extortionate means, involved five or more persons as required by § 3B1.1(b). The district court's determination of Nuzzo's role in the offense, and the number of people involved in the offense, is a factual finding reversed only if clearly erroneous. *Schweihs,* 971 F.2d at 1317; *United States v. McKenzie,* 922 F.2d 1323, 1329 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 163, 116 L.Ed.2d 127 (1991). Evidence offered at trial indicated Nuzzo dispatched two gentlemen, named "Bob" and "Bingo," to collect a gambling debt from an extortionee named Graczyk. Evidence further indicated Nuzzo worked with the conspiracy's leaders, Zizzo and Morgano, to organize gambling oversight activities in northern Indiana. An upward adjustment under § 3B1.1 applies to those defendants whose "relative responsibility" for the crime is greater than their cohorts, *United States v. Vargas,* 16 F.3d 155, 160 (7th Cir.1994); *United States v. Skinner,* 986 F.2d 1091, 1097 (7th Cir.1993), and is generally warranted if the defendant exercised authority or control over other members of the crime. *Vargas,* 16 F.3d at 160; *United States v. Brown,* 944 F.2d 1377, 1381 (7th Cir.1991). Here the evidence amply indicated both Nuzzo's authority over other members of the enterprise and his greater relative responsibility for the criminal acts. As

for the exact number of individuals involved, "participant" is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt., n. 1. Evidence clearly indicated many individuals (and at least five), both indicted and unindicted, were involved in the overall racketeering conspiracy. Defendant's focus on whether five or more individuals participated in the particular collections of debt recited in the predicate acts is misplaced. Section 3B1.1(b) applies if the "criminal activity involved" five or more people, a phrase broad enough to include the entire racketeering conspiracy rather than the particular predicate act alone. *See Schweihs,* 971 F.2d at 1318 (focusing on entire offense, not just individual acts of extortionate conduct, in determining number of participants). Based on this evidence, the district court's decision was not clearly erroneous and the three level increase was appropriate. So agrees the commentary to the Sentencing Guidelines, which provides that "[i]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered." U.S.S.G. § 3B1.1 cmt., n. 2. Thus, Nuzzo's attempt to narrowly focus the § 3B1.1 inquiry on the number of persons involved in the specific act of extorting Graczyk is simply misplaced, and the district court's decision to enhance his sentence was not clearly erroneous.

Lastly, Nuzzo argues the district court should have grouped together his pre-Guidelines conviction for operating a gambling business, Count 4 of the indictment, with predicate act No. 57 to arrive at his RICO sentence. Section 3D1.2 of the Guidelines provides that "[a]ll counts involving substantially the same harm shall be grouped together into a single group," U.S.S.G. § 3D1.2, because "[s]ome offenses that may be charged in multiple-count indictments are so closely intertwined with other offenses that conviction for them ordinarily would not warrant increasing the guidelines range." U.S.S.G. ch. 3, pt. D, intro. cmt. Counts involve "substantially the same harm" if part of a common scheme or plan, U.S.S.G. § 3D1.2(b), or if the "offense behavior is ongoing or continuous in nature and the of-

fense guideline is written to cover such behavior," *id.* § 3D1.2(d). A defendant, of course, hopes to group together as many counts as possible to avoid the possible incremental increase in a sentence associated with loss, harm, or other bad effects stemming from related, but ungrouped counts of conviction. *See United States v. White,* 888 F.2d 490, 496–97 (7th Cir.1989). Perhaps extortion (predicate act No. 57) and gambling (Count 4) are, under this Guideline provision, closely related and otherwise involve substantially the same harm to require grouping. Not every offense, however, is subject to this grouping procedure and some, in fact, are specifically excluded. *See* U.S.S.G. § 3D1.2(d) (listing offenses included and excluded from grouping); *United States v. Bruder,* 945 F.2d 167, 170 (7th Cir.1991). One such offense explicitly excluded from the grouping procedure of § 3D1.2 is that covered by § 2B3.2 of the Guidelines—extortion in violation of 18 U.S.C. § 1951. Because predicate act No. 57 did indeed involve extortionate conduct, and was subject to sentencing under § 2B3.2, it therefore cannot be grouped with other offenses. Thus, the district court properly refrained from grouping together predicate act No. 57 with any other count and the Defendant, in arguing to the contrary, again simply misreads the effect of the Sentencing Guidelines.

## IX. Conclusion

Although the Defendants, individually and collectively, raise many issues surrounding their convictions and sentences, none have merit nor require their convictions or sentences to be disturbed. In all respects the convictions and sentences are AFFIRMED.